Your Honors, may it please the Court, my name is Alan Murakami. I represent Hui Malama I Na Kupuna O Hawaii'i Nei, and I will refer to my client as Hui Malama for short. I would like to reserve some time in the end, about five minutes for anybody. Keep an eye on the clock. Yes, I am. The basic issue before this Court, Your Honors, is the question of whether the Hawaii District Court may, pursuant to a mandatory preliminary injunction, compel my client, Hui Malama, contrary to its members' religious and cultural beliefs, to remove ancient Hawaiian burial objects from what is known as the Kauai High Caves on the Big Island, in order to reopen repatriation that the Bishop Museum completed under the Native American Graves Protection and Repatriation Act. You know, I'm not sure that's the issue at all. All right. Because there's a very, very deferential standard of review. So really, the issue is whether the judge applied an incorrect legal standard, misapprehended the law, or relied on clearly erroneous findings of fact. See, now we're in a different setting here. The way you describe the issue, it sounds more like the trial court setting, and we've got a very detailed document in front of us by a very experienced judge. I understand. And so you've got to convince us, in order to penetrate that, you've got to convince us that Judge Edwards, that Judge Ezra used an incorrect legal standard, misapprehended the law, or had some erroneous findings of fact. We believe the answers to those questions is yes in each instance, Your Honor. And begging with due respect, I do believe that you are correct, and my question has been posed to you in relation to those three questions. But I'd like to kind of back up a little bit, because in terms of the facts, I think it's very important to understand the context of this case in terms of its history. And it started 100 years ago, when grave robbers took these, I'm going to call them moipub, or funerary objects, from the Kawahai Cave in direct contradiction to the prevailing law at the time. The Bishop Museum thereafter acquired these items, knowing they were stolen, frankly. And I think, as since conceded because of this knowledge, this foreknowledge, has no right of possession of these items at all under NAGPRA, I will use as abbreviation for the Native American Graves Protection and Repatriation Act. And so that's very clear. It's also clear that in 2000, while there were only four claimants under NAGPRA to these moipub, Hui Malama, my client, took these items and returned them to the cave where they were. On loan. As a loan. On loan. I'm going to get to that. I understand that this is going to be a point of controversy. See, we know the facts. I don't want to shy away from the loan aspect, but I also want to make clear that my client. And allegedly put them someplace. Well, that's according to the trial court, Your Honor, and I'm going to get to that hopefully as soon as I can, if I can follow my outline. But it was. We're way ahead of your outline, but go ahead. Okay. Let's get to that point right away, Your Honor, because it is a point of apparent, I believe, manufactured contention that the location of moipub is uncertain. If the court reviews the specific declarations and materials brought before the district court, there is not one piece of evidence other than the legal argument of my opposing counsel that suggests that there is uncertainty in the location of these moipub. Every piece of evidence points directly to the fact, and there's no real dispute that can point it to us, and we're trying to find it, where some fact has been posed to us, or allegation has been posed to us, saying that the moipub are anywhere else than the Kauai High Caves. Now, we've said so unequivocally in our pleadings. How many caves are there in the area? This is – there – I mean, there's probably unknown numbers of caves, Your Honor, in that area, in the general area. In the area that's called that. Okay. The area of the Kauai High Caves is somewhat complex because it is one cave with sub-caves within it. And therefore, you might see some references to caves or caves, but it is a cave – one cave, and it's been treated that way. So from – as you see the record, someone reading the record. Yes. And knowing the way around that part of Hawaii. Yes. Could walk directly to the place where these are located, right? Well, there's no signs pointing to it. Definitely not. That's the point. I mean, that's part of the point. We don't know where they are. Well, that's district court. They didn't know where they were. Well, what about the loan part? I mean, you got them as a loan. Okay. Is that wrong? The loan was called a loan, yes, Your Honor. But let me – I'd like to address that, but simply leave the point about the location. If Your Honors can point to be a factual allegation based on at least a sworn affidavit or declaration pointing to an issue as to the location, I'd be happy to address that, but we have not been able to find that. And so in our minds, Your Honor, and I think in – on the record before you, it is not disputed where the items are. It's only been suggested by argument and the Court picked up on that. We believe that that is an abuse of discretion. Well, that – That's only one part of the issue. Yes, it is. But it became a part. As you see the record, then, the information your client provided would tell anyone who wants to know precisely where these artifacts are located. Well, not by meets and bounds, Your Honor. And, you know, there's some sensitivity amongst the Hawaiian community as to exact locations of, frankly, burial remains and funerary objects. If the Court is to order them to be restored, which it has, and that order stays in place, then whoever is told to go get them can go get them. Yes. Just on the record as it exists right today with no supplementation. There would have to be some knowledge as to where this is located, Your Honor. But it is – I don't think there's – through the years of consultation from 1996 to 2000, at the time of the reinterment, numerous Hawaiian organizations understood where this location was. They may not have known about it and pointed to the opening of the cave on the ground. But it's not a secret as to the Honokoa Gulch of the Kauai High Area where this cave is. So the recovery team, without more, could go get them? I'm sorry? So the recovery team designated to recover the artifact could go get them? Absolutely. If it turns out that we are somehow required, which we believe should not happen, to achieve that result. Let me be very specific. The Court writes, The Court is greatly troubled in particular by the failure of Hui Malama to be forthcoming with even the most basic information regarding the current whereabouts of the Moipi. Hui Malama has submitted no evidence regarding the location or condition of these items, only the arguments of counsel. Indeed, as Defendant Bishop-Museum noted with dismay, Defendant Hui Malama's own memorandum states that the items are allegedly stored. So they say you submitted no evidence regarding the location. That's right, Your Honor. We disagree with that. And where was the evidence of the location that you say you submitted? It was submitted in the Declaration of Halealoha Edward Ayao, the director of Hui Malama. And he talks about it. Where's that in the excerpt? Let's see. It is attached to the opposition memo that we submitted. It was to the hearing of the motion for preliminary injunction. And where is it in the excerpt of that? I apologize. I'll try to find that specific page reference, but I don't have it right before me. But in that declaration, he specifically says that he participated directly in the 2000 reinterment of the Moipu at that time. And so there is no dispute that, at least on the record, that that's where the items are. Now, nobody submitted a similar or contrary affidavit or declaration saying, well, I have information that says that the Moipu are somewhere else. That statement does not appear in the record anywhere. And so that's why we are troubled by this suggestion by the court that there is some withholding of information that is somewhat confusing to the members of the public. I want to point out to you in a somewhat related vein, Judge, that in the record on KOO 107, which is the summary of the Bishop Museum's history of this proceeding, it is very clear that the Hui Malama appeared at a March 22, 2000 meeting right after the reinterment and told all four claimants at that time, they're the only ones around who are officially claimants recognized, where the location of the Moipu were. The summary says that the claimants appeared satisfied with Hui Malama's presentation. There was no dispute as to where these Moipu were back then, as there is not really on the record here today, and that the meeting was in no way confrontational. That's on K00109. Now, if the four claimants who had the legal status to be recognized as the claimants to these Moipu were satisfied and did not confront Hui Malama contemporaneous practically with the time of the reinterment, then I suggest to you, Your Honor, that the Court is mistaken and has made a factual error about this issue about the location of the Moipu. Now, I can get to it. I was going to get to the loan next, but if there's another question, I'll address that. Well, where they're located is only one of the concerns of the district court, Judge. The district court also found that there were serious questions going to the merits of the plaintiff's claim. Okay. Should I get to that or the loan first? Well, wrapped up in that is the loan, which is these items were loaned. Okay. All right. And the effect of that was the taking then and not returning them. First of all. Interfered with the repatriation process so that there was not a full repatriation under the Act. There are a couple of assumptions in your statements, Your Honor, that I need to in effect challenge with all due respect. First of all, the loan, the word loan does not appear in NIPRA as a manner of returning items to a native group under the terms of either the regulations or the statute. That is a vehicle of the museum curation industry. And if you consider what I said earlier, Your Honor, that the Moipu were taken or bought by the museum knowing they were stolen a hundred years ago, an obvious response is how do you lend back stolen items? Well, the museum was about to invoke the repatriation process under NAGPRA. I understand. And there's a certain process that's to be followed. Right. And there's no real dispute that at that point in time the museum was in – had control and possession of the items. Isn't that correct? For the loan? Yes. Okay. Isn't that correct? That's true, Your Honor. And we're not disputing that. What we are disputing, however, is that the principal presumption legal by the other parties and apparently the court, lower court in Hawaii, is that it is absolutely necessary to have physical custody of the Moipu in order to complete consultation for repatriation. And that is absolutely not true if you apply properly the regulations and statutes governing NAGPRA. Well, the district court had the two opinions of the NAGPRA review committee. Okay. And I'm going to get to that. The NAGPRA review committee opined, essentially, that the consultation process had not been proper. Flawed. Or flawed. Right. Yes. So, I mean, all that just goes to the district court's determination, to put this in the I found serious questions going to the merits of the claim. I understand. And the review committee, in all due respect, is absolutely wrong and exceeded its authority to reach conclusions of law where the statute and the regulations only empower it to make findings of fact and to make some and to facilitate dispute resolution, make recommendations on how to resolve dispute, not to make not to choose sides, frankly, but to facilitate the disputes that arise under NAGPRA. They did not do that. They took sides and made conclusions of law that, frankly, cloud this process unnecessarily and, we believe, illegally. And I have to call this Court's attention to the fact, frankly, that the initial 2003 so-called findings and recommendations, which we believe in part largely were suggested that the loan be recalled so that the claimants, now the 14, 13 claimants now have access to the moipu before repatriation is completed. That has not ‑‑ I don't have this on the record, Your Honor. And what I'm suggesting is last week on Friday I got information from the review committee that is completely different than what is on the record before you. And I would wish to have either this Court take judicial notice of that fact or I will submit documentation suggesting that if this Court is, in fact, going to rely on a review committee, it should be aware of the difference of the positions now taken by the review committee as of December 2, 2005. That compares very differently from 2003. And what's your understanding of how repatriation is completed under the Act? Okay. I'm going to try to mix all the various questions because they are interrelated. The loan, as I said, is a creature of the museum industry. It is not a creature of NAGPRA because NAGPRA specifically in its provisions and its regulations allow a Native Hawaiian organization to request the return of funerary objects in this instance where it has an entitlement, which Hui Malama does. I think that's not disputed. And where the museum cannot show any right of possession, which it can't, it's already conceded in the record, it must relinquish custody to that Native Hawaiian organization. Now, the only question of the other claimants. No. But when you say the other claimants, at that point in time, there were only four because the other nine that appeared later came after the reinterment. So it's very important to understand that this was a subsequent act to the reinterment. There was nobody to upset, in a sense, other than the four claimants at the time of the reinterment and so-called loan. But the repatriation had not been completed at that time. That's right. But you can still allow physical custody to be relinquished to a Native Hawaiian organization, in this case one of the four, but still continue on with repatriation, which has a separate track under the statute and the regulations. Now, I'm sure the other side contests this, but they have not cited one rule or one portion of statute that creates this bifurcated process. You are what NAGPRA is designed to do is to give Native people a step up, a greater hand in the negotiation with museums. And one of those steps up is to allow them to ask for physical custody pending repatriation. And, in fact, that's what the loan agreement says. We make this loan pending repatriation. Once repatriation is completed and possession and control under the regulation is delivered then to the claimants that are recognized, that completes the process and shifts over legal control and custody and title, frankly, to the claimants. And that's what happened after the reinterment. But the question becomes whether or not prior to repatriation, physical custody must be in the hands of the museum. And the regulations and statute is very clear that it doesn't require that to happen. And, in fact, that Hui Malam was under its full rights to ask for custody after six years since the initiation of repatriation to get custody. The rules provide for 90 days for repatriation to occur once a request is formed. In this case, the first request failed in 1994, and repatriation occurred in 2000, six years. So Hui Malam was in its total rights to ask for custody, which it did get. And it's also in its right not to have to be forced to bring it out when new claimants come forward to protest and try to get physical custody back to the museum. That is not a -- Do you want to save some time for rebuttal? Yes, I would. Okay. Thank you very much. I still want you to find me the part in the excerpt. I will. Because in your blue brief, you never made the argument you made today. You said the simple problem with where the objects are was that the district court erroneously shifted the burden on you. That's true. You never said in the blue brief, we demonstrated where they are. So I want to know where in the excerpt I can find that. All right. I'll look for that IALA affidavit or declaration. Good morning, Your Honors. Judge Trott, Judge Nelson, and Chief Judge Paez. Not quite. No? Okay. Well, just before I even get going. Never. Judge Schroeder is the chief judge. He's the presiding judge, which is more important. So go ahead. Well, right at this minute, the presiding judge is the most important one. All right. Well, it's. Okay. So it's Hui Malama 95 in response to your question, Judge Trott, on where it is that Mr. Ayau says where the items are. But we submit that that is not sufficient, what he said. What did he say? All he says is paragraph number two. At the time of the repatriation, I was a member of Hui Malama, and Kunani Nihipali was the po'o. I was directly involved in the repatriation of the Iwi Kupuna, ancestral human remains, and Moipu funerary objects, which my clients don't agree with, to the burial caves at Honokaua Gulch, Kauai High, in 2000. And that's all he says. And so I think back to what Judge Nelson was asking about. Well, is there more than one cave there, and where exactly is it? I think that that is insufficient information. And I think Judge Ezra was particularly concerned, because what happened is that in the pleadings, the lawyers make the statement that they're allegedly buried there. No representation has been made that that is withdrawn. But irrespective of that, I think it is unclear where they are. You know, maybe there are some that know. I don't know who they are, but maybe there are some that know exactly where they are. But that doesn't mean the district judge knows or the rest of us know. Is that an area? See, I have no idea what we're talking about. This is always dangerous. You tell lawyers, you better know what you're talking about before you start talking about it. And we haven't been. Is this a cave with a sealed cement front with iron bars on it or something like that, that the stuff is in? Or what does it look like? I mean, caves, it could be like mammoth caves, which are thousands of them all over the place. Or is this an area that you can only get to through a sealed door? Have you seen it? I have not seen it, and I can't answer that question because this is part of the problem, is that we don't know where it is, and we don't know how it's sealed or what it is. And so we don't have any more information, really, other than what Judge Ezra had, because, you know, we all know the general area of where it is. So, you know, not all Hawaiians agree that these priceless artifacts are funerary objects, and not all Hawaiians agree that if they are, they should be buried. And that includes my clients in particular. And so I represent Nale Ali'i Kauananakoa, and the president and founder is Abigail Kinoiki Keikaliki Kauananakoa. She is a lineal descendant of the great chiefs and monarchs of Hawaii. She is the great-granddaughter of King Kalakaua and Queen Kapiolani. She is the granddaughter of Prince David La'amea Kauananakoa and Abigail Wahii Ka'ahula Campbell. And she was adopted by them, her mother in the ancient Hawaiian tradition, her mother Lydia Ka'eha Lili'uokalani Kauananakoa gave her for adoption, and she is therefore Princess Abigail Kinoiki Keikaliki Kauananakoa. I also represent the Royal Hawaiian Academy of Traditional Arts. Its president and founder is La'akea Suganuma. He is the grandson of Mary Kawena Pukui, the author of the... The point is there are a number of legitimate contenders, and they disagree as to what should happen to these. That's exactly right. The process must go forward, and what Judge Ezra did was simply try to preserve the subject of the controversy against the possibility of irreparable harm. That's exactly right, Your Honor. And all of the claimants at the present time, the 14 claimants, are all identified for their cultural affiliation. So nobody has at this time any greater status. There is no recognized lineal descendant, and nobody has any greater status. The loan itself... What's the significance of the point that your opponent plays upon that at the time of the loan there were only four claimants? And I take it probably your client was not one of them. Neither one of my clients were claimants at that time. There is, you know, I guess Judge Ezra points out a loan is a loan, and a document was signed that says that it's a loan. It indicates on the document that the loan is being made pursuant to requests by Hui Malama and Department of Hawaiian Homelands. This is on Saturday the loan is made in violation of the museum policies, and you can see the museum policies at K100. And this is in direct violation. One individual signs off on the loan. It doesn't go through the proper procedures. It's never approved by the director of the museum. And so on Monday the museum finds out that the Department of Hawaiian Homelands, in fact, did not agree, didn't even agree to a loan, never mind a burial of the items. And so I think that one can only conclude that it was either false pretenses or a misrepresentation when the loan was signed by Hui Malama. If we uphold Judge Ezra's ruling, what happens? Play this out for us with respect to these disputed items. Okay, the case goes back to the district court. Judge Ezra has indicated that he will send federal officials on this task to recover the items. He has indicated he has ordered Hui Malama or whomever else has knowledge of where these items are. I can't speak for Judge Ezra, but certainly there has been speculation that some of these items are priceless and people may have broken and stolen them. So if he's successful, they'll be sequestered. Yes. And then a determination will be of what? Okay, he ordered that the items come back to the Bishop Museum. Once they're there, what happens next with all these claimants? What happens next is presumably the process will start again. The Bishop Museum has indicated its willingness and commitment, really, to continue the process of discussion. And so the items will come back. There will be further discussions. What's the discussion about? About what to do with the items. It may come that the day comes that a federal court will have to decide. I thought under the statute that the museum ultimately says, all right, here are the 14 claimants. You now have control and custody over them. You decide what to do with them. Is that right? Well, the museum did publish such a notice. Now the museum admits that it was wrong to do so, especially given the situation where the items were gone. One claimant had asserted its views and philosophies over those of the other claimants. And so the process really couldn't continue. I think there's a lot of hard feelings. Contrary to what counsel says for Hoi Malama, there is a right to have an opportunity to view the objects as well, to make a determination as to what are they and where are they properly going to be. What do you see happening? Somebody is going to be given the authority to do with these items X, Y, or Z, and the others are going to be blocked out? Is that what happens if there's a big fight and nobody can agree on anything? There will be winners and losers in traditional terms, and then we'll end up in court again? Well, I'm afraid that Your Honor is correct, that that is a possibility that should there be no agreement, at the end of the day perhaps we will have to come back to court. And NAGPRA anticipates in the case of competing claims that if you can't resolve your dispute, just like in any other situation in our country, if you cannot resolve your dispute at the end of the day, if you have the right to come to federal court, you can come to federal court. And NAGPRA does give people the right to come to federal court, especially in the situation of competing claims. So if you take a look at 25 U.S.C. 3005E, it specifically says that if at the end of the day you can't resolve competing claims, you can come to court and it will be resolved by a court of jurisdiction. 3013 in NAGPRA specifically says that the court, the federal court shall have jurisdiction over any action brought by any person alleging a violation of NAGPRA, and the court shall have the authority to issue such orders as may be necessary. You know, I think that... At least this ultimately gives the court the authority to dispose of the items that we're talking about within the confines of the expectations of the law. Right. And at this point, you know, I think we're sort of jumping ahead because, you know, it may be that an agreement can be reached. I mean, that would, of course, be the ideal situation if an agreement could be reached among the Native Hawaiians who are claimants in this process. If no agreement can be reached, then it may be necessary. I said I was exploring ultimately the court's power to begin to tell people within the law what's going to happen with these, which undergirds then the power to issue this kind of an order to try to preserve them against irreparable harm while this process is being sorted out. Yes. Does there have to be an agreement among the claimants about what's going to happen to the items before repatriation can take place? Well, in this particular situation, I think the gravamen of the problem was that the items were released before the process of repatriation had even begun. And a complaint was filed by the Office of Hawaiian Affairs with the National Park Service right after the items were released. And the National Park Service wrote a letter, you know, pointing out that there had been no agreement among the parties as to where and when the repatriation would take place. And immediately after that notice was published, which was already after the items had been released by the Bishop Museum, as soon as the notice was published, seven more claimants immediately came forward to make claims. And so, you know, the process was really sabotaged. And, you know, I think a lot of you know, it's hard to sit down and negotiate and discuss and come to a reasonable conclusion or to have any agreement when one party goes ahead and asserts itself and signs an agreement that says it's a loan and has absolutely no intentions whatsoever of returning them. I also refer you to, in the record, K-46, which was the statement of the head of Hui Malama to the NAGPRA Review Committee, at which time he was asked, at the time that you signed this loan agreement, if the museum had asked for the items back prior to the execution of a repatriation, would you have returned the items? Answered by Eddie Ayau, no. So there was never any intentions whatsoever once the document was signed saying it was a loan to bring the items back. And I submit, Your Honors, that that is just not right and it shouldn't be permitted. And I think Judge Ezra's decision was based on very specific facts, and he went through the whole record. He found that the NAGPRA Review Committee had substantial basis for what they found. And so basically he made his own findings as to what had happened. He made his own particular findings of fact as to what had happened. And so I think their First Amendment claim also has no merit. I don't think that by going ahead and doing something that really was wrong that they can now come into this court and hide behind the First Amendment. And I think Judge Ezra very sensitively looked at their claims under the First Amendment, and he tried to do everything he could to make sure that they wouldn't be in a situation where the First Amendment would be violated. And so I don't think that they can make those kinds of claims. So unless Your Honors have any further questions, I'm going to allow my Bishop Museum to have a moment to argue. May it please the Court, I'm Linda Lee Farm. I'm here on behalf of the Defendant Appellee, Bernice Pauahi Bishop Museum. The Bishop Museum was founded in 1889 by Charles Reed Bishop in honor of his late wife, Bernice Pauahi Bishop, who is recognized by many as the last descendant of the Kamehameha family. Serving and representing the interests of Native Hawaiians is a primary purpose of the museum. And the museum has been designated by statute as a State of Hawaii Museum of Natural and Cultural History. The museum is in a very difficult position, and I notice that Judge Trott is agreeing with me on that, being here. And the museum has apologized for any wrongdoing it may have done in the past and sincerely wishes to do the right thing and to reset the repatriation process. What I would like to do is to answer some of the questions since there is relatively limited time. With respect to Hui Malama's counsel about the loan being simply a nature of the museum, the loan is actually defined in the NAGPRA Glossary, and it's attached to the addendum to Bishop Museum's filing. A loan, by definition, anything furnished for temporary use to a person at his request on condition that it shall be returned or to be equivalent in kind without compensation for its use. To say that the loan was improper, and both sides seem to imply that in a very subliminal way, is not correct. Hui Malama is well aware that loans had been made in other repatriations to it by the museum. There was nothing unusual about making this loan to facilitate repatriation. And part of the purpose of making the loan was to allow the claimants the opportunity to view the items, to have a certain amount of rapport with the items in the process. And that is one of the main reasons why the later recognized claimants are being denied their rights. They do not have that ability to actually have access to the items, to participate in the process, because Hui Malama has taken the items and reburied them somewhere. Now, with respect to the location, and I know this is an issue which Judge Trott and probably all of you are concerned about, it's not only were they taken and where were they placed in 2000. Judge Edgewell is very concerned about where are they today? What condition are they in? Are they going to be suffering from irreparable harm? Are they subject to thievery, degradation by the elements, by insects? And if I could. I must say, what is it, 2 million insects or something like that? Right. Wood eating insects? There are innumerable insects which now exist in Hawaii. And some of the items are made of wood and are subject to, frankly, being destroyed. And if they are destroyed, there is irreparable harm. There is no way that these items can be replaced. But I'd like to read from the transcript, if I may. And it is part of the record. It is at BM 103. And this is Judge Edgewell's position with respect to the location. I would be much more sanguine and much less likely to take affirmative action in this case if I was confident that these remains were in an appropriate location, hermetically sound, kept in a fashion that would provide for their integrity. But I have nothing in front of me that indicates that is the case. And nothing was said as far as factual evidence by Hui Malama. Nothing was presented. Any efforts belatedly by Hui Malama to do so were waived at the time. That was the record before Judge Edgewell when he issued his preliminary injunction. He did not abuse his discretion. He did not make any errors of law. He looked at the facts in front of him. And with cultural sensitivity and true caring for equal opportunity for all of the claimants, he chose to issue, take a very brave step, quite frankly, but a correct step, to issue the preliminary injunction so that the artifacts can be preserved, so that there can actually be a deliberation, a trial on the merits. Something can be decided as to the proper disposition of these items. I don't know if any of you have any questions for me. I'd be happy to answer any questions. Since the museum is not a claimant, it does not have a claim for right of possession, as it is defined in NAGPRA. And many of these terms are used very loosely. And I think it's very important when the court goes back and reviews the record and the clerks review the record very carefully that they take a look at the definitions. For instance, there was discussion by Learning Council about giving up control. The museum never gave control. Control is a legal interest, and it is defined in NAGPRA. And the definition should be looked at carefully. Therefore, Your Honors, the Bishop Museum would request that Judge Ezra's order be affirmed and that the stay, which is now in place, be lifted, and that further proceedings be allowed in this case. Thank you. Thank you very much. You have a few minutes of rebuttal. Judge Stroud, I take it that you've been given the citation. I have. Thank you. Learning Council on the other side reads as a definition of loan that seems to counter what you were telling us earlier, that a loan really doesn't have anything to do with all of this. And once you get possession, it's all over. There is a definition of loan in NAGPRA, in the regulations. There is not, however, a place for a loan in this circumstance, where the museum has no right of possession because they took stolen goods knowingly. And they cannot loan something that is stolen, that they knew that was stolen. You know, the case to me gives every appearance of, and I mean no disrespect, but your side trying to hijack a process that's supposedly to allow everybody who has a potential claim, and there seem to be many here, to come to the table and sort it out. And your side comes across as trying to hijack that process. Well, I think that view, with all due respect to Judge Stroud, I think is misinformed because the interpretation of NAGPRA is being ignored here, frankly. I hear, you know, prices of artifacts. I hear false pretenses. I hear inflammatory accusations thrown at Huey Malama, and I hope that one of them will stick. But the truth is, if one looks at the law, closely at the law, it is absolutely clear that repatriation can occur and need not occur with the items physically present before the claimants. What are your client's intentions if at the end of the day, and there's a long process that we've heard about, there's an order that the items themselves be returned and something else be done differently with them by other parties? Will you have the same response? How is this order issued? The district court comes to a final conclusion that they are not properly in the cave, that they need to be returned to somebody else to do something different with them. Frankly, Your Honor, it sounds to me like what you're telling us is that you're not going to accept that. Well, frankly, Your Honor, what I'm trying to do is say that we accept the law. And what the law provides is that once repatriation is complete, then the decision-making of the disposition of these items are now in the hands of the 13 co-owners. And it shouldn't be in the hand of the museum or a 14th claimant that comes in late that was only recognized this year, four years after repatriation is complete. See, all the district court is saying is the district court has concluded there's a danger of irreparable harm to very valuable objects that everybody agrees in. And the district court is simply trying to make sure that that harm doesn't come about, that the objects be protected, and then a decision is made according to the law as to what to do with the objects. I'm not sure what the big problem with that is. There's no legal error that I see. It seems to make a lot of sense in the conclusion that these objects may be in danger is supported by the law, by the evidence in the case. May I answer this question? Yeah. You can answer Judge Stratton's question. Judge Stratton, again, with all due respect, because I think something has to be very clear here. NAGPRA is the reflection of a congressional choice that frankly makes the issue of whether or not these items are priceless or not irrelevant to these proceedings because the whole idea of NAGPRA is to restore or reset the balance that was imbalanced, the imbalance of power between Native people and museums who were saying exactly what you're saying about the pricelessness of various objects that they had taken without consent from Native people. And what had happened is that Congress recognized that over 150, 200 years of this history, Native people were deprived of that ability to be able to negotiate. The museum is out of this now, and it's between the people who have a legitimate claim. But all I'm saying is that what the trial court did is that it took that policy choice made by Congress and flipped it on its head because it's using the pricelessness of these objects as a means to evaluate the irreparable harm in this case, which is not appropriate. I don't mean dollar value when I say pricelessness, not only dollar value. Most of the claimants, it's not the dollar value that's important to them. That's right. That's why it's priceless. That's right. But it seems to have affected this court's conception of why it needs to step in to protect these items from the bugs, from the theft, which are totally speculative. It's the dollar value. That's what priceless means. We don't care about the dollar value. There's another value that's at stake. That's right. That's right. And all I'm saying is that the value attached and the harm that it inferred from this so-called value attached was based totally on speculative statements that are not backed up by sworn affidavits. The problem with the client's response is trust us. You know, we know where it is. You don't know where it is. We know the condition they're in. You don't know. But trust us. They'll be fine. I don't think that there's an element of trust us in terms of where the items are. So far, the district judge has said you were not forthcoming about location and how they were placed, and there's nothing in the record that supports your statement that says, yeah, people know where they are. But I'll do respect Judge Reynolds. I think there is evidence in the record, and it's totally false to say that my client has withheld that evidence. It's completely unbased on the evidence. It depends on how you read the record. Thank you, counsel. We appreciate your argument. The matter will be submitted.
judges: Trott, T.G. Nelson, Paez